UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 18-30001-WGY |
| | ) | |
| vs. | ) | |
| | ) | |
| DAPHNE MOORE, Defendant. | ) | |
| | ) | |

---

**DEFENDANT DAPHNE MOORE'S MOTION TO SUPPRESS
ALL EVIDENCE DERIVED DIRECTLY OR INDIRECTLY FROM THE
WARRANTLESS POLE CAMERA SURVEILLANCE AND RECORDING
OF HER HOME AND RELATED ACTIVITY AT 120 HADLEY STREET,
SPRINGFIELD, MA**

---

Defendant Daphne Moore hereby moves, pursuant to the Fourth Amendment of the United States Constitution and F.R.Cr.P. 12, for entry of an Order suppressing evidence derived directly or indirectly (fruits) from the warrantless surveillance and continuous recording of her home, her activities, her family and guests from May 17, 2017 through approximately mid-January 2018.[1]  In support of and as grounds for her Motion, the defendant, through counsel, states that:

---

[1]
Many of the documents filed by the government were filed under seal. The defense has filed on CD, under seal, Appendix of Exhibits to All Pretrial Motions.  Each of the Motions filed on behalf of Defendant Daphne MOORE incorporates the Appendix of Exhibits and uses the same exhibit references throughout all pretrial Motions.

A.  Relevant Facts

In January of 2017, the ATF began investigating Nia MOORE-BUSH (defendant's daughter) and Dinelson DINZEY (defendant's son-in-law) regarding the unlawful sale of firearms and trafficking in heroin.  Exhibit A[2][2] TIII_0000151.  DINZEY & MOORE-BUSH were believed to be traveling between Springfield, MA and Vermont in connection with their unlawful activities.  Ms. MOORE lives at 120 Hadley Street in Springfield.  DINZEY and MOORE-BUSH started living at 120 Hadley Street, off and on, commencing the end of February 2017.  MOORE-BUSH has two (2) children who are cared for by her mother, the defendant DAPHNE MOORE.  Exhibit A[2] TIII_0000166.

On or about May 17, 2017, the ATF installed a pole camera on a utility pole across the street from Ms. MOORE's home at 120 Hadley Street. Exhibit A[2] TIII_0000160.   120 Hadley Street "is located on a quiet residential street where physical surveillance [is] difficult to conduct without detection."  Exhibit A[2] TIII_0000257.

The pole camera records and transmits constantly but the zoom function can only be operated when the camera is being monitored in real time.  Exhibit A[2] TIII_0000258.  No judicial authorization was obtained for the use of the

---

[2]

All documents related to the November 9, 2017 Title III Application were filed under seal and are incorporated herein by reference.  These documents are also filed on CD herewith, under seal, as Exhibits A [1]-[5].
A[1] - Application; A[2] - Affidavit; A[3] - Order; A[4] Government Memorandum; and A[5]; and, A[5] Chambers Proceeding transcript.

pole camera. The government obtained information from use of the pole camera that it included in its Title III Applications[3]. For example:

> 68. Physical and pole camera surveillance revealed that after the eviction, MOORE-BUSH and DINZEY relocated to [Daphne] MOORE's residence at 120 Hadley Street in Springfield.
>
> 209. Pole camera footage showed that the Hertz Infinity came and went from 120 Hadley Street on July 16 and 17, 2017.

Exhibit A[2] TIII_0000160; TIII_0000218.   See also Exhibit B[4][2] TIII_0000045; TIII_0000048-49; Exhibit C[5][2] TIII_0000379; TIII_0000382; TIII_0000387-90.

The pole camera surveillance was employed to identify people and vehicles visiting 120 Hadley Street, who the government later alleged are co-conspirators in conspiracy charges against Ms. MOORE. These allegations are

---

[3]

On February 5, 2019, the government declined to specify the pole camera footage it intends to use at trial. The government informed the defense that the pole camera footage would be produced once a 3.5 TB to 4 TB hard drive was provided. Correspondence of 02/04/19 - 02/05/19 is attached and incorporated as **Exhibit #1.** The government has yet to specify the pole camera footage it intends to use at trial.

[4]

All documents related to the November 27, 2017 Title III Application were filed under seal and are incorporated herein by reference. These documents are also filed herewith on CD, under seal, as Exhibits B[1]-[3]. Exhibit B[1] - Application; B[2] - Affidavit; B[3] - Order.

[5]

All documents related to the December 14, 2017 Title III Application were filed under seal and are incorporated herein by reference. These documents are also filed herewith on CD, under seal, as Exhibits C[1]-[3]. Exhibit C[1] - Application; C[2] - Affidavit; C[3] - Order.

based, *inter alia*, from pole camera surveillance and wiretap intercepts, including the unlawful interception of the communications of Daphne MOORE, Oscar ROSARIO and Joshua FOSTER.[6]   ATF Agent Bzduch testified about the result of the pole camera surveillance in the grand jury that returned the original indictment, including observations of Ms. MOORE and some of her co-defendants.  Exhibit G - at GJ_0000066-67.

The 120 Hadley Street pole camera footage was also used to identify and investigate people who have/had no apparent connection to the investigation.[7] For example, in the November 9th Affidavit the government  reported that "via pole camera surveillance", the registration of a car parked in the driveway of 120 Hadley Street had been traced through law enforcement database.  The name, birth date, phone number and Florida address of the registered owner were identified, as well as the fact that he/she had formerly had a Massachusetts driver's license.  No reference to this person appears in any other investigative report, either before or after the pole camera sighting. Nonetheless, the affiant concludes: "I know by my training and experience that Florida is a source location for heroin and other drugs trafficked into the

---

[6]

See, DEFENDANT DAPHNE MOORE'S MOTION TO SUPPRESS UNLAWFULLY INTERCEPTED WIRE, ORAL AND ELECTRONIC COMMUNICATIONS AND ALL EVIDENCE DERIVED DIRECTLY OR INDIRECTLY THEREFROM

[7]

The government has provided a list of Unindicted Co-conspirators; the person named and identified in the Affidavit does not appear on that list.

Springfield, Massachusetts area." Exhibit A[2] TIII_0000247.

This kind of surveillance adversely impacts Ms. Moore's privacy rights and those of every person who visits her home, whether invited or uninvited. The Fourth Amendment was especially intended to protect the privacy of the home. The results of this prolonged, warrantless surveillance violated the privacy rights of Ms. Moore. She was unable to have any private association with anyone at her home; ever visitor was investigated.

B. The Pole Camera/Video Surveillance and Its Fruits should be Suppressed

The pole camera installed by the ATF on May 17, 2017 was focused on 120 Hadley Street, Ms. Moore's home, and continuously recorded activities associated with her private life for more than eight (8) months. When being monitored, the pole camera could zoom in on residents, visitors, vehicles, service providers - anyone and everyone who is connected in any way to Ms. Moore's home.

The principal aim of the pole camera surveillance, in the beginning, was to learn the whereabouts of DINZEY and/or MOORE-BUSH at particular times and on particular dates. However, because of the continuous nature of the surveillance, all of Ms. Moore's movements in and out of the home were also captured for a period of eight (8) months. This allowed the government to go back over footage and make a determination regarding whether Ms. Moore was at home on specific dates and at specific times related to the investigation.

5

Ms. Moore is an attorney who worked in the Hampden County Superior Court full time throughout the investigation. She also taught at Springfield College and cared for her two (2) grandchildren as their legal guardian. The intimate details of Ms. Moore's private life are portrayed in footage that captures not only her comings and goings, but also records her associations with family and friends.

Discovery has not disclosed the particular model and all capabilities of the pole camera used in this case. However, recommended must-have features include: audio/video recording to assist law enforcement in analyzing details and identifying suspects; remote connectivity making the video surveillance accessible at any time and any where from any portable device, i.e. authorized laptops, smartphones, or tablets; pan-tilt-zoom capabilities allowing it to hone in on specific people or areas and affording a wider field of view; and, a user-friendly video management system (VMS), software that allows remote users to search through hours of recordings in minutes. PoliceOne.com, 8 must-have features of law enforcement pole cameras, 12/11/2018.

In this case, the warrantless pole camera continuous surveillance was employed in conjunction with the wiretaps, coordinating intercepts with the view of events at 120 Hadley Street - Ms. Moore's home.

The warrantless use of pole camera surveillance violated Ms. Moore's Fourth Amendment right to be protected from unreasonable government

intrusion into her life.  See, *Carpenter v. United States*, 138 S.Ct. 2206, 22219 (2018).   The pole camera footage/images must be suppressed, along with all evidence derived directly or indirectly therefrom.  *Wong Sun v. United States,* 371 U.S. 471, 487-488 (1963)*.*

When first confronted with a challenge to law enforcement's warrantless, extended use of pole camera surveillance, the First Circuit concluded that the defendant had failed to establish an expectation of privacy with regard to the front of his house.  *United States v. Bucci*, 582 F.3d 108, 116 (1st Cir 2009). Unlike the pole camera used in the instant case, the one used in *Bucci* "'had no remote capabilities that allowed agents to either change the view or magnification without being physically present at the scene.'" *Id.*

The court's analysis focused on the absence of any physical obstruction to a view of the front of the house, suggesting that erection of fences or shrubbery was necessary to demonstrate an inclination to privacy.   *Id*. Interestingly, there was a law enforcement complaint in Ms. Moore's case that "the view of 120 Hadley Street is partially obstructed by a tree."  Exhibit A [2] at TIII_0000258.  Similarly, 120 Hadley Street is described as "located on a quiet residential street where physical surveillance would be difficult to conduct without detection."  Exhibit A [2] at TIII_0000257.  Perhaps the choice of neighborhood and the planting of a tree suggest an expectation of privacy. Indeed, it seems unlikely that the framers expected a person to erect a

barricade around her home to shield it from extended and continuous surveillance. A person's "home, though a hovel is his castle, precisely because the law secures freedom from fear of intrusion by the police except under carefully safeguarded authorization by a magistrate." *Harris v. United States*, 331 U.S. 145, at 164 (1947)[8](Frankfurter, J dissenting, Justices Murphy and Rutledge concur, dissenting).

The search and seizure landscape, particularly regarding the scope of individual privacy rights, has changed considerably since *Bucci* was decided. In *Bucci*, the court's analysis began with the proposition that the merits of a motion to suppress could not be addressed unless the defendant first established that his/her own Fourth Amendment rights had been violated. *Id.* Thus the defendant was required to show that she has "a reasonable expectation of privacy in the place to be searched" before the reasonableness of the search would be scrutinized. 582 F.3d at 116, n. 5. Fourth Amendment analysis does not require the approach employed by the First Circuit:

> Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim.

*Byrd v. United States,* 138 S.Ct. 1518, at 530 (2018). Ms. Moore asserts that

---

[8]

    *Harris*, held that the search of an entire home incident to the lawful arrest therein of the legal resident, did not violate the Fourth Amendment. 331 U.S. at 155. That holding was subsequently overruled by *Chimel v. Califronia*, 395 U.S. 752, 768 (1969).

the merits of her challenge to the unwarranted, eight (8) month continuous surveillance and recording of activities associated with her home life must first be examined for reasonableness under current Fourth Amendment jurisprudence.

*Bucci* accepted that the government's use of the pole camera constituted a search of garage area and driveway of the defendant's home. However, the court concluded that these areas were knowingly exposed to the public and therefore not entitled the Fourth Amendment protection. 582 F.3d at 117. This limited view of the Fourth Amendment protection of the home was rejected in *Florida v. Jardines*, 569 U.S. 1, 4 (2013), where the question to be answered was whether a search had occurred when police took a drug sniffing dog onto the clearly exposed front porch of a home, for the purpose to looking for evidence of a crime. The answer is yes: "The government's use of trained police dogs to investigate the home and its immediate surroundings is a "search" within the meaning of the Fourth Amendment." *Jardines*, 569 U.S. at 11. Thus, with or without shrubbery, a person has a reasonable expectation of privacy in her home and surrounding property.

The prolonged, covert use of a hidden pole camera to spy on and record the activities associated with a private home invades privacy in a manner much different from simple physical surveillance. In general, United States citizens do not expect law enforcement to be allowed to undertake this kind of

9

surveillance without resort to a judicially approved warrant: "society expects that law enforcement's continuous and covert video observation and recording of an individual's front yard must be judicially approved. . . ."  *United States v. Vargas,* 2014 U.S.Dist.LEXIS 184672, at *17 (Wash ED 2014).

A person has a "reasonable expectation of privacy in the whole of [her] physical movements." *Carpenter v. United States,* 138 S.Ct. 2006, at 2219 (2018); *United States v. Jones*, 565 U. S. 400, at 430 (2012)(Alito, J. concurring in judgment).  *Carpenter* addressed law enforcement's warrantless accessing of CSLI information where that information is in the hands of a third party, and concluded that the acquisition of the defendant's CSLI datawas a search that generally requires a warrant supported by probable cause. *Supra* at 221.  The government used an 18 USC §2703(d) subpoena to access the defendant's CSLI records but the showing necessary for the subpoena "fell well short of the probable cause required for a warrant." *Id*.  The CSLI search invaded Carpenter's personal privacy interests that are protected by the Fourth Amendment.

The pole camera surveillance focused on Ms.Moore's home recorded the whole of her physical movements in and out of her home for a period of eight (8) months.  Prolonged surveillance, for Fourth Amendment purposes, is not only quantitatively but also qualitatively different:

> Prolonged surveillance reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly,

what he does not do, and what he does ensemble.

*United States v. Maynard*, 615 F.3d 544, at 561-562 (D.C. Cir. 2010), aff'd sub nom *United States v. Jones,* 132 S.Ct. 945 (2012).   The pole camera surveillance and recording catalogued the privacies of Ms. Moore's personal life - her visitors, deliveries, associations, etc, as well as the time and date of all of her physical movements in and out of her home - a "too permeating police surveillance".  *United States v. Di Re*, 332 U.S. 581, at 595 (1948).

The *Carpenter* court recognized that modern technology has created new challenges for Fourth Amendment analysis:

> Although no single rubric definitively resolves which expectations of privacy  are entitled to protection,1 the analysis is informed by historical understandings "of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted." Carroll v. United States, 267 U. S. 132, 149, 45 S. Ct. 280, 69 L. Ed. 543, T.D. 3686 (1925). On this score, our cases have recognized some *basic guideposts*. First, that the Amendment seeks *to secure "the privacies of life" against "arbitrary power*." Boyd v. United States, 116 U. S. 616, 630, 6 S. Ct. 524, 29 L. Ed. 746 (1886). Second, and relatedly, that *a central aim of the Framers was "to place obstacles in the way of a too permeating police surveillance*." United States v. Di Re, 332 U. S. 581, 595, 68 S. Ct. 222, 92 L. Ed. 210 (1948).   (emphasis added)

*Carpenter v. United States*, 138 S.Ct. at 2213-2214.  It is difficult to imagine what could be a more permeating police surveillance than what is provided by a pole camera constantly recording the activities associated with a person's home.  As the court observed in *Carpenter,* constant surveillance can reveal "familial, political, religious, and sexual associations."  *Carpenter*, 138 S.Ct. at

11

2217, quoting *United States v. Jones*, 565 U.S. 400, at 415 (2012).

As with CSLI data, the acquisition of a comprehensive and detailed recording of Ms. Moore's private life is a search deserving of Fourth Amendment protection and that protection is afforded by a warrant. This court should decline to grant the government unrestricted access to intimacies of Ms. Moore's private life absent a warrant authorizing the intrusion:

> As Justice Brandeis explained in his famous dissent, the Court is obligated—as "[s]ubtler and more far-reaching means of invading privacy have become available to the Government"—to ensure that the "progress of science" does not erode Fourth Amendment protections. Olmstead v. United States, 277 U. S. 438, 473-474, 48 S. Ct. 564, 72 L. Ed. 944 (1928). Here the progress of science has afforded law enforcement a powerful new tool to carry out its important responsibilities. At the same time, this tool risks Government encroachment of the sort the Framers, "after consulting the lessons of history," drafted the Fourth Amendment to prevent. Di Re, 332 U. S., at 595, 68 S. Ct. 222, 92 L. Ed. 210.

*Carpenter,* 138 S.Ct. at 2223.

Before the police can set up a pole camera to record the activities intimately associated with a home, they should be required to heed the *Riley* admonition - get a warrant. *Riley v. California*, 573 U.S. 373, at 403 (2014).

WHEREFORE, for the reasons set forth herein, defendant DAPHNE MOORE, requests a hearing at which the government must establish that the use of the pole camera surveillance and recording, over an eight (8) month period, falls within one of the narrow exceptions to the warrant requirement. Upon hearing, entry of an Order suppressing all evidence obtained directly

and/or indirectly as a result of the unconstitutional searches and seizures that resulted from the continuance pole camera surveillance in violation of Ms. Moore's Fourth Amendment rights.

DAPHNE MOORE, Defendant
By her attorney,

/s/ Linda J. Thompson

Linda J. Thompson, BBO#496840
THOMPSON & THOMPSON, P.C.
1331 Main Street
Springfield, MA 01103
(413) 739-2100
Fax: (413) 739-2300
Email: linda@ttpclaw.com

Certificate of Service

The undersigned hereby certifies that this document, filed through the ECF system, will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF) on April   , 2019.

/s/ Linda J. Thompson